**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

JESUSA GARCIA WRIGHT,                    :

      Plaintiff,                    :

vs.                    :    CA 14-00575-C

CAROLYN W. COLVIN,                    :
Acting Commissioner of Social Security,

                                      :

      Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g), seeking judicial review of a final decision of the Commissioner of Social Security denying him claims for period of disability and disability insurance benefits.  The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court.  (Docs. 17 & 19 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.")).  Upon consideration of the administrative record, the Plaintiff's brief, the Commissioner's brief, and the arguments of counsel for the Parties at the October 29, 2015 hearing before the Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

---

[1]    Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 17 & 19 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.")).

Plaintiff alleges disability due to mild degenerative disc disease, tembromandibular joint disease ("TMJ"), insomnia, anxiety, and depression. The Administrative Law Judge ("ALJ") made the following relevant findings:

**1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.**

**2.     The claimant has not engaged in substantial gainful activity since February 26, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).**

**3.     The claimant has the following severe impairments: mild degenerative disc disease, tembromandibular joint disease (TMJ), insomnia, anxiety, and depression (20 CFR 404.120(c)).**

These impairments have caused more than a minimal limitation in the claimant's ability to perform work activity.

**4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

\*     \*     \*

**5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except the claimant can frequently climb ramps or stairs; frequently climb ladders, ropes, or scaffolds; frequently balance, stoop, crouch, and crawl. She must avoid concentrated exposure to work around unprotected machinery or work around unprotected heights. The claimant can perform simple, routine tasks with simple workplace decisions and few workplace changes. The claimant can have occasional interaction with the public or coworkers.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)-

-i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant alleges that she cannot work due to her anxiety, depression, insomnia, neck pain, back pain, and arthritis (Exhibit B2E). The claimant alleges that she cannot sleep at night and cannot be out in the public or even carry a conversation. She stated that she left her last job due to increased stress while working in a bank. She testified that she has panic attacks four to five times a week. She stated that these are associated with becoming nervous; however, she stated that she has never gone to the hospital due to a panic attack.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

In terms of the claimant's physical impairment, her alleged limitations are not supported by the evidence. She only established care with Lourdes Virtusio, M.D. in June 2012. However, the claimant was examined by Henrietta Kovacs, M.D. in July 2011. She complained of trouble with a headache and back ache. However, the MRI of the claimant's spine showed only a "normal variant" and "minimal spurring along the superior endplate of Ll. However, the claimant had no flank tenderness or abnormal findings on the lower extremities. She had no swelling or tenderness. Likewise, she was able to squat, walk on her heels, and walk on her toes. She had a normal gait. Likewise, she confirmed that the only problem arising from her TMJ was a recurrent headache. Dr. Kovacs observed that she had normal range of motion and considered her back impairment only mild (Exhibit B4F).

However, the claimant has sought treatment for her back pain but the

degree of irregularity as well as the other evidence of the treatment itself fail to support the severity she alleges. Even most recently, the claimant's treatment notes showed no motor weakness, abnormal gait, or abnormal neurological signs. The claimant's only clinical sign was tenderness "across the lumbar area." Furthermore, she had only two examinations total in 2013 (Exhibit B16F).

Even prior to that time, there was virtually no treatment for her back, and the only positive clinical finding remained this general tenderness across her lumbar spine area. She was never prescribed any ongoing narcotic mediations. More importantly than the minimal, limited evidence that is present, the treatment notes are virtually absence any recommendation for treatment other than the medications prescribed. There was no suggestion for any orthopedic referral by her current physician or any consideration to her complaint that she did not have the resources to see a specialist (Exhibit B14F). Likewise, the extensive absence of significant treatment or other clinical signs or diagnostic testing is far more consistent with the indication that she does not require specialist treatment. Her minimal back impairment was being treated adequately with the limited, conservative treatment she has obtained.

In December 2012, the last examination with Dr. Virtusio, the claimant did obtain one single psychiatric referral. However, He noted that she has pain everywhere as well, despite a normal gait. He stated that she did report having back pain at that time. However, his treatment notes also largely fail to indicate any problems with her back or other significant physical complaints. His treatment also consists of solely three examinations (Exhibit B13F). The claimant testified that she has Tricare, and, ultimately, there is no reason that she has sought so little treatment. Her limited follow-up over time and the conservative nature of her treatment only serves to refute her allegations of symptoms from any physical impairment to the degree that she has alleged.

Furthermore, the claimant was examined by William Crotwell, M.D. in January 2013. Despite this being nearly the most recent examination in the medical evidence, she confirmed that she had no surgery, no epidural injections, no nerve conduction studies, and no MRI scans. Dr. Crotwell described the claimant's treatment as conservative treatment with medications, which the treatment notes clearly have shown. However, Dr. Crotwell did perform x-rays of her cervical, thoracic and lumbar spine. However, he stated that there was no objective evidence of any reason for pain. He noted that she had no real treatment with a specialist or a neurosurgeon. Even during his examination, the claimant only reported pain with bending, twisting, or torqueing in the mid back. She reported that her neck and right arm pain was persistent all day. She reported that

her lower back pain was persistent as a 9/10 all day.  However, he immediately noted that the claimant was able to move and twist.  She also denied any numbness or tingling despite the complaint that her lumbar pain extended down the right posterior thigh.  He also noted that she got up and down from the examination table without any difficulty.  He stated that she used no assistive device and reported cooking, cleaning, driving locally, and walking two to three blocks.  She also was able to flex past ninety degrees while sitting and bending.  She removed her socks with "no difficulty at all."  He stated that she did only forward flex for approximately thirty or forty degrees, but he noted that this was a poor attempt based on the bending she had done already in the office.  He stated that she had no spasms in the thoracic or lumbar area.  He stated that her straight leg raising test was questionable on the left and suspect also on the right.  He stated that she did this activity on her own without pain, but the testing appeared painful with even passive movements.  He noted that she had no scoliosis or other deformity.  Ultimately, he concluded that she would be able to carry out medium, light, or sedentary work.  [H]e stated that she would definitely be able to work for an eight hour workday.  He explicitly stated that he found no major orthopedic problems with the claimant at all.  He completed a form that, based on the limitations, places the claimant at the very heavy exertional level.  However, he stated that she can only frequently bend, squat, crawl, or climb (Exhibit B16F).

Still, the claimant reported that she has been prescribed a number of medications for pain, anxiety, and to sleep over time.  She reported only dizziness and drowsiness as reported side effects of her medications in Exhibit 2E and she has not identified any other recurrent symptom according to the treatment notes.  Although it is obvious that drowsiness is not a side effect of a medication taken to sleep, the risk of over-sedation is possible.  Therefore, extensive consideration has been given to the side effects or direct effects of the claimant's medications in the claimant's overall limitations (Exhibit B2E).  However, the effects of these complaints would be more than adequately accommodated with the limitations regarding work around unprotected machinery or work around unprotected heights.

Therefore, the claimant is given the benefit of the doubt that she cannot lift and carry heavy weight.  She should lift and carry no more than twenty-five pounds frequently or fifty pounds occasionally due to her back impairment, despite its mild nature.  Similarly, due to her physical complaints and the possible side effects of her medications that were reported, the claimant can only frequently climb ladders, ropes, or scaffolds, even ramps or stairs.  She also must avoid concentrated exposure to work around unprotected machinery or work around

unprotected heights.  Furthermore, due to her back impairment the claimant can no more than frequently crouch and crawl or even balance and stoop.

In terms of her mental impairments, the claimant's alleged limitations also are not fully supported by the evidence.  Although the claimant reports difficulty with interpersonal interaction, she has also suggested some problems in concentration.  Still, the claimant reported that she has no problems with her personal care.  She even reported that she can prepare simple meals, clean, and do the laundry despite her limited assertions of any concentration problem.  The claimant even confirmed that she does these activities without encouragement from others that she needs to do them.  She stated that she does go outside daily.  She stated that she can drive short distances in town.  She stated that she even shops weekly for forty-five minutes to one hour at each time.  Even if that were time spent with her husband in the store, her own interaction with others to undertake that activity is inconsistent with her allegations.  She acknowledged that she even can pay bills and handle bank accounts.  She stated that she can drop bills off at the post office that need to be mailed.  Still, she claims that she has no interest in any conversation or activities with others at all.  On the other hand, she denied having any problems getting along with authority figures or ever being laid off for problems getting along with others.  It is acknowledged that she may have experienced difficulty in her last banking job; however, she acknowledged herself that this was a high stress situation caused by a particular manager.  She reported not handling stress well; nevertheless, she stated that changes to her routine are not a problem.  She even reported that she visits others and talks on the phone or the computer to other people.  She even confirmed that she attends church regularly.  She ultimately stated that she only "*sometimes* cannot face people."  Nonetheless, in that same answer, she suggests that she "cannot carry [on] a conversation" (Exhibit B4E, emphasis added).  Nevertheless, the degree of her allegations is inconsistent with her reports that she shops because, while limited, she must interact in that situation.  She also must interact, to some degree, even to drive.

With regard to concentration or memory complaints, the claimant even acknowledged that she can pay attention for fifteen to twenty minutes and follow either written or spoken instructions adequately.  She even stated that she can remind herself to take medications appropriately by keeping a note pad.  Most recently, following her examination of the claimant, Dr. LaCostay [*sic*] noted that she was inconsistent in her ability to perform simple one and two digit addition, subtraction, multiplication, and, division problems without the use of paper and pencil while not being

able to perform even serial threes.  The claimant made numerous errors and took an excessive amount of time to respond.  Still, she could count backward from 20 to one, spell the word "world." backward, and, name the months of the year in reverse order without error.  Dr. LaConsay stated that the claimant can understand, carry out, and remember simple instructions.  She stated only that tasks that are more complex in nature and that require multiple steps might be more challenging for her (Exhibit B15F).

Nevertheless, the most significant inconsistency with the claimant's complaints of debilitating panic attacks is that she has extensively failed to obtain any treatment with a mental health specialist.  She confirmed repeatedly through the treatment notes and at the hearing that she has Tricare insurance.  Even beyond that coverage, she confirmed that she obtains a military pension of some type that provides her $3800.00 a month.  She could be excused for not obtaining extensive treatment; however, she has chosen to obtain no treatment with any specialist whatsoever, even from a free or reduced cost source.  Beyond the issue of her unwillingness to obtain treatment, the infrequency and conservative nature of treatment even from her general practitioners, particularly regarding the issue of mental health, but also regarding all of her impairments, provides the claimant no support in the extent of her allegations.  With regard to mental health, she has never required inpatient treatment, emergency treatment, specialist treatment, or even individual therapy.  There is no evidence that she even sought out a counselor, community program, or church program of any type.  The claimant has virtually no attempts to change medications or even suggestions that her medications are ineffective during treatment.  A single indication during treatment that they "will do a psychiatric referral" in December 2012 has not occurred.  In fact, she stopped even obtaining treatment from Dr. Virtusio following that recommendation (Exhibits B13F, B14F, and B17F).  The claimant testified that she has never been treated by a psychiatrist or psychologist.

The claimant testified that she only takes medications to treat her panic attacks.  She testified that she stays in the bed at those times.  However, she testified that she does not even perform housework for herself.  She stated that her husband performs these duties.  Although she reported this same caveat in Exhibit B4F, she ultimately still concluded that there were a large number of activities that she did perform herself that are inconsistent with her allegations that the panic attacks or depression are debilitating to the degree she suggests.

The claimant did complain of "stress" during treatment for other

complaints in May 2009.  Nevertheless, at that time, she denied all anxiety, depression, and difficulty sleeping, specifically.  She was provided a brief course of Lexapro.  However, there was virtually no other treatment (Exhibit B1F).  She was obtaining treatment for her physical complaints as well as routine testing for other conditions; however, she simply began to be prescribed Pristiq, which has never changed in dosage or frequency, and briefly amitriptyline, which as also never been adjusted with regard to frequency or amount taken.  The claimant was advised only to take amitriptyline at night.  Likewise, she has always taken extended release Pristiq (Exhibits B13F, B14F, and B17F).

Most recently, during treatment with Dr. Ndolo, the review of symptoms indicates that she "denies mood, sleep, and ETOH problems" during her examinations in both February and April 2013.  She clearly indicated her history of problems.  Nonetheless, his examination report failed to even include any consideration of mental health problems except for her medical history.  Moreover, those two examinations make up the entirety of her 2013 treatment (Exhibit B17F).

Even prior to that time, the claimant only began treatment at all with amitriptyline in December 2012. However, obviously, given the recommendation to take the medication at bedtime, it was also related to complaints of insomnia.  Although the claimant was diagnosed with "depressive disorder other" at that time, there was no evidence of any clinical findings of depression in the examination report.  She even still "denies mood, sleep and ETOH problems" according to that very examination report.  Regardless of [t]his inconsistency, the claimant did state that she had "severe stress and depression" this time.  She stated that her medications were not working.  On the other hand, she never reported panic attacks, her nearly sole complaint at the hearing.  Although the 2013 treatment notes completely fail to provide the claimant any support, she did have some treatment in 2012.  However, even at that point, it was still infrequent and exceptionally conservative.  She had medication adjustments and changes for insomnia symptoms. However, there was no change for the treatment of her depression or anxiety (Exhibit Bl4F).  In fact, at the hearing, she testified that she stays in bed all day. This is directly contradictory to the repeated complaints of insomnia during treatment.  Even most recently, she was still taking at least one sleeping pill, if amitriptyline were to be attributed to only other conditions (Exhibit B17F).

Moreover, longitudinally, the treatment notes themselves document inconsistency in even the claimant's own reports.  She had no interest in doing anything in December 2012 due to her mental impairments (Exhibit Bl3F).  Then, after virtually no change in treatment, and almost no treatment at all for months, she reports fatigue, but also trouble falling asleep. There was no mention of depression or anxiety during that

examination.  The follow-up examination indicates that she is "not getting enough sleep."  Now, she testified that she sleeps all day.  Furthermore, Dr. Ndolo repeatedly documented that she was not complaining of mood or sleep problems in his review of symptoms.   The claimant never reported "panic attacks" (Exhibits  B14F and B17F).  Now, the claimant testified that she has panic attacks several times a week that would prevent her from working.  Even if these panic attacks included and accompanied general anxiety symptoms also, Dr. Ndolo's treatment notes are, at best, conservatively treating her condition, and, at worst for the claimant, documenting that this minimal degree of treatment is effective. There is only one single report that medications were not working, and that examination led him to add a medication (Exhibit  14F).

Given those conditions, Dr. Kravitz's endorsement of the state agency decision and the opinion by Dr. Koulianos that the claimant can understand, remember, and carry out short, simple instructions; have infrequent contact with the public; and have minimal changes in the work setting are the most consistent opinions with the entirety of the evidence (Exhibits B3F and B10F).  Furthermore, more recently, Dr. LaConsay also stated that she can understand, carry out, and remember simple instructions.  She also stated that the claimant . . . could be expected to respond appropriately to supervision, co-workers, and, work, pressures in a work setting (Exhibit B15F).

Therefore, despite her combination of impairments, the claimant can still perform simple, routine tasks with simple workplace decisions and few workplace changes.  However, I give her full benefit of the doubt that she should have only occasional interaction with the public or coworkers.

As for the opinion evidence, great weight must be given to the opinion evidence in Exhibit B1F reiterating the limitations documented on Exhibit B7F.  These opinions are provided by an "acceptable medical source." Likewise, they are the largely consistent opinions with the remainder of the evidence.

However, greatest weight is given to the opinion of William A Crotwell, M.D.  His specialization in orthopedic medicine provides his opinion greatest weight.  His opinions are extensively consistent with the medical evidence and the most consistent opinions regarding the specific function by function limitations.   Moreover, his examination report and the findings provide his opinion vast support.

Great weight is given to the opinion of Dr. Kravitz and Dr. Koulianos. Their conclusions are the most consistent with the remainder of the evidence.  Their specializations in mental health treatment provide their

opinions added weight.  Furthermore, they are largely consistent with the observations throughout the treatment notes regarding the limited nature of symptoms and the effectiveness of treatment over time.

However, I cannot give any significant weight to the opinion evidence expressed on the form in Exhibit 15F.  It is not consistent with the narrative examination report, the GAF score of 55 she provides, or the notation that the claimant is noncompliant with large portions of the examination.  These conclusions are even directly inconsistent with the claimant's own self- reports in Exhibit B4E or the moderate, limited nature of the treatment advised or obtained through Dr. Ndolo or any other source.  I also note that the claimant denied having taken any medications the day of Dr. LaConsay's examination.  I give far greater weight to Dr. LaConsay's narrative opinion and the GAF of 55.

I also give no weight to the opinion expressed on the form in Exhibit B12F. Although this is completed  by Dr. Ndolo, a treating  physician, he is not a mental health specialist.  His responses on this form are inconsistent with any of his treatment notes.  Likewise, his failure to ever have referred the claimant to a specialist or even significantly change his limited treatment of the claimant is inconsistent with the degree of limitations arising from her mental impairment that he or the claimant have alleged. The infrequency of Dr. Ndolo's treatment and the moderate nature of his treatment both provide his opinion in Exhibit B12F no significant weight.

In sum, the above residual functional capacity assessment is supported by the inconsistency of the claimant's symptoms over time, the effectiveness of medications suggested by their consistency over time, the observed willingness of her treating physician to change medication less than fully effective, the activities of daily living inconsistent with the claimant's allegations, the lack of consistency in the diagnostic testing or clinical signs evident over time, the narrative opinion of Dr. LaConsay, the opinion of Dr. Koulianos as reinforced by Dr. Kravitz, the opinion evidence in Exhibit B11F, and the opinion of Dr. Crotwell.

**6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).**

*        *        *

**7.     The claimant was born on December 24, 1956 and was 54 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  The claimant subsequently changed age category to advanced age (20 CFR 404.1563).**

**8.     The claimant has at least a high school education and is able to**

communicate in English (20 CFR 404.1564).

**9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or· not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 1404, Subpart P. Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional  exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.22 and Rule 203.15.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled medium occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as packager, DOT Code 920.587-018; laundry aide, DOT Code 323.687-010; silver wrapper, DOT Code 318.687-018; and night cleaner, DOT Code 323.687-014.  The vocational expert testified that there are approximately 4,000 jobs as a packager; 4,000 jobs as a laundry aide;

1,200 jobs as a silver wrapper; and 3,700 jobs as a night cleaner in the state of Alabama.  She testified that there are approximately 330,000 jobs as a packager; 400,000 jobs as a laundry aide; 107,000 jobs as a silver wrapper; and 293,000 jobs as a night cleaner in the national economy.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

**11.   The claimant has not been under a disability, as defined in the Social Security Act, from February 26, 2011, through the date of this decision (20 CFR 404.1520(g)).**

(Tr. at 15 & 17-25 (emphasis in original)).   The Appeals Council affirmed the ALJ's decision (*id.* at 1-3), and, thus, the hearing decision became the final decision of the Commissioner of Social Security.

## DISCUSSION

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation when determining whether a claimant is disabled, which considers

(1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairments in the regulations; (4) if not, whether the claimant has the [residual functional capacity ("RFC")] to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.*, 457 Fed. App'x 868, 870 (11th Cir. 2012)[2] (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden, at the fourth step, of proving that he is unable to perform his previous work. *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. *Id.* at 1005. Although "a claimant bears the burden of demonstrating an inability to return to his past relevant work, the [Commissioner of Social Security] has an obligation to develop a full and fair record." *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted). If a plaintiff proves that he cannot do her past relevant work, as here, it then becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is capable—given his age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Phillips*, 357 F.3d at 1237; *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied*, 529 U.S. 1089 (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that he can perform those jobs identified by the vocational expert ("VE") during the administrative hearing, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a

---

[2]      "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

conclusion.  *Richardson v. Perales*, 402 U.S. 389 (1971).  "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[3]  Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence."  *Davison v. Astrue*, 370 Fed. App'x 995, 996 (11th Cir. 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).  And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'"  *Id.* (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).

On appeal to this Court, the Plaintiff asserts three reasons why the Commissioner's decision to deny her benefits is in error (*i.e.*, not supported by substantial evidence): (1) the ALJ erred in giving greater weight to the opinions of non-examining, record reviewing consultants than to the opinion of the consultative examiner, Dr. Kendra LaConsay, Psy.D.; (2) the ALJ erred in rejecting the opinions of Dr. Joseph Ndolo, M.D., the Plaintiff's treating physician; and (3) the ALJ erred by identifying available jobs at the light, unskilled level for the Plaintiff as Grid Rules 202.04 and 202.06 direct a finding of disabled if she is limited to light, unskilled work.  The undersigned initially will address the first two arguments together and then consider the remaining issue of the ALJ's identification of jobs existing in the national economy that the Plaintff can perform.

---

[3]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**I.      The ALJ's Assessment of the Opinions of Dr. Ndolo and Dr. LaConsay**

The Plaintiff contends that the ALJ erred in rejecting the opinions of Dr. Ndolo provided in his mental RFC Questionnaire.  On August 3, 2012, Dr. Ndolo completed said questionnaire, (Tr. at 289-90), indicating that the Plaintiff has a "marked" restriction of daily living; a "marked" degree of difficulty in maintain social functioning; "marked" deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere); a "marked" limitation in ability to respond to supervision and to co-workers in a work setting; and a "marked" limitation in ability to perform simple and repetitive tasks in a work setting.  (*Id.* at 289).  Dr. Ndolo also stated that the Plaintiff has three episodes or decomposition in work or work-like setting which cause her to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).  (*Id.*).

As the Plaintiff's treating psychiatrist, Dr. Ndolo's opinions "must be given substantial or considerable weight unless 'good cause' is shown to the contrary."  *Gilabert v. Comm'r of Soc. Sec.,* 396 F. App'x 652, 655 (11th Cir. 2010) (per curiam) (quoting *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997)).  Good cause is shown when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id.* (quoting *Phillips*, 357 F.3d at 1241).  "Where the ALJ articulate[s] specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error."  *Id.* (quoting *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005)).

Here, the ALJ gave Dr. Ndolo's opinions set forth in his mental RFC Questionnaire "no weight," stating:

> I also give no weight to the opinion expressed on the form in Exhibit B12F. Although this is completed by Dr. Ndolo, a treating physician, he is not a mental health specialist. His responses on this form are inconsistent with any of his treatment notes. Likewise, his failure to ever have referred the claimant to a specialist or even significantly change his limited treatment of the claimant is inconsistent with the degree of limitations arising from her mental impairment that he or the claimant have alleged. The infrequency of Dr. Ndolo's treatment and the moderate nature of his treatment both provide his opinion in Exhibit B12F no significant weight.

(Tr. at 23). The undersigned construes the ALJ's comments as an implicit (if not explicit) finding that Dr. Ndolo's opinions were conclusory and inconsistent with the doctor's own medical records, as well as not bolstered by other evidence of record.

Upon review of the record, the Court finds that the ALJ has shown good cause by articulating specific reasons supported by substantial evidence for giving "no weight" to Dr. Ndolo's opinion. As the ALJ stated, his conclusions in the mental RFC questionnaire are conclusory and inconsistent with his treatment notes. His treatment notes reflect 11 visits with the Plaintiff between March 6, 2012 and April 3, 2013. (*Id.* at 313-41 & 356-63). While the treatment notes show that the Plaintiff periodically complained about sleeping issues, anxiety, and depression, none of the notes indicate that Dr. Ndolo, who is not a psychiatrist or a psychologist, performed any mental status examinations or otherwise evaluated her in an objective manner that would substantiate his impressions or opinions of her psychiatric limitations. (*See id.*). Further, Dr. Ndolo's treatment of the Plaintiff regarding these alleged mental issues was infrequent and inconsistent, as well as conservative in light of the severity of the Plaintiff's mental limitations indicated in his mental RFC questionnaire. As the ALJ carefully detailed in his decision, the treatment notes reflect that Dr. Ndolo irregularly

prescribed the Plaintiff medications for depression, anxiety, and insomnia and that when the medicine was prescribed, the dosage and frequency of such prescriptions largely remained unchanged.  (*See id*. at 21-23, 313-41 & 356-63).  In addition, despite the supposed severity of the Plaintiff's limitations, Dr. Ndolo never referred the Plaintiff to a specialist or significantly altered his moderate treatment of the Plaintiff's mental issues.[4]  Contrarily, however, Dr. Ndolo's final three treatment notes, the final two of which make up the entirety of the Plaintiff's 2013 treatment, reflect that the Plaintiff "denies mood, sleep, and ETOH problems."  (*See id.* at 330-32 & 356-63).  Accordingly, the Court finds that the ALJ's articulated reasons for giving no weight to the August 3, 2012 mental RFC findings of Dr. Ndolo are supported by substantial evidence and, thus, the ALJ did not commit reversible error.

The undersigned now turns to the ALJ's assessment of the opinions of Dr. LaConsay.  The Plaintiff contends that the ALJ erred in giving greater weight to the opinions of Dr. Joanna Koulianos and Dr. Larry Kravitz, non-examining, record-reviewing consultants than to the opinion of the consultative examiner, Dr. LaConsay.

The law in the Eleventh Circuit is clear that while "'the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion'" and the ALJ articulates his reasoning for rejecting the

---

[4]     While the Plaintiff argues that Dr. Ndolo did not refer her to a specialist because her insurance did not cover psychological treatment, there is no evidence that she attempted to obtain mental treatment from a specialist, even from a free or reduced cost source.  Further, Dr. Ndolo's treatment records do not indicate that specialized treatment was recommended or necessary.  However, even assuming the Plaintiff's insurance argument is true, it does not explain the conservative and infrequent nature of Dr. Ndolo's personal treatment of the Plaintiff's mental issues.

subject opinion.  *Sryock*, 764 F.2d at 835 (quoting *Oldham v. Schweiker,* 660 F.2d 1078, 1084 (5th Cir. Unit B 1981)).; *see also Hickel v. Comm. of Soc. Sec.*, 539 F. App'x 980, 985-86 (11th Cir. 2013) (unpublished).

Here, the ALJ stated that he could not give "any significant weight" to Dr. LaConsay's opinion in the Medical Source Statement of Ability to Do Work-Related Activities (Mental) form (the "MSS Form") attached to her consultative psychological evaluation.  (Tr. at 23).  The ALJ provided several reasons for this determination, specifically, (1) her conclusions in the MSS Form are not consistent with her narrative examination report, the GAF score of 55 she provides, or the notation that the Plaintiff was noncompliant with large portions of the examination; (2) her conclusions in the MSS Form are directly inconsistent with the Plaintiff's own statements in her function report and the moderate, limited nature of the treatment advised or obtained through Dr. Ndolo or any other source; and (3) the Plaintiff denied having taken any medications the day of Dr. LaConsay's examination.  (*Id.*).  Instead, the ALJ gave greater weight to Dr. LaConsay's opinion in the narrative examination report and the GAF of 55.  (*Id.*).

The Court finds that no error was committed because the evidence of record, as the ALJ articulated in his decision, supports his determination to not give "any significant weight" to Dr. LaConsay's opinions in the MSS Form.  In the MSS Form, Dr. LaConsay states, *inter alia*, that the Plaintiff has a "moderate" restriction in understanding and remembering complex instructions; "moderate" restrictions in interacting with supervisors, co-workers, and the public; "marked" restrictions in carrying out complex instruction, making judgments on complex work-related decisions, and responding appropriately to usual work situation and changes in a routine work setting.  (*Id.* at 348-49).  Dr. LaConsay stated that her assessment of the

Plaintiff's limitations in interacting with others and responding to work situations was supported by the following factors: "[s]ignificant depression & anxiety lead her to avoid people; easily overwhelmed and quickly becomes disorganized with the most minimal of stressors."  (*Id.* at 349).  Dr. LaConsay also stated that in light of the Plaintiff's performance on simple tasks administrated during her examination, she is slower to process information and to formulate a response.  (*Id.*).

As the ALJ stated, these conclusions are not consistent with the narrative report in her consultative psychological evaluation.  Although Dr. LaConsay did state in her report that the Plaintiff's overall affective expression was "dysphoric" and that she is easily overwhelmed by the most minimal of stressors, she specifically stated that because the Plaintiff "was non-compliant with certain aspects of this examination . . ., [o]verall, this is not felt to be an accurate and representative assessment of her abilities." (*Id.* at 345-47).[5]  Further, despite being prescribed several medications, including ones for anxiety, depression, and insomnia, the Plaintiff denied having taken any medications the day of Dr. LaConsay's examination.  (*Id.* at 343-44).[6]

---

[5]  The Plaintiff argues that "[t]he fact that Mrs. Wright did not complete one of several tests is quite different from being noncompliant with 'large portions of the examination' as stated by the ALJ.  (Doc. 12 at 12).  However, Dr. LaConsay did not state that the Plaintiff was noncompliant with only one test, but that the Plaintiff was noncompliant with *aspects* of the examination with one example being the Rotter Incomplete Sentences Blank.  (Tr. at 347).  Nevertheless, no matter how many aspects of the examination with which the Plaintiff was noncompliant, the noncompliance was enough for Dr. LaConsay to opine that *"[o]verall*, this is not felt to be an accurate and representative assessment of [the Plaintiff's] abilities." (*id.* (emphasis added)).

[6]  Notably, Dr. LaConsay stated in the narrative report that "with both participation in and compliance with psychological and/or psychiatric interventions to deal with her depression and anxiety, she could re-enter the work force."  (Tr. at 347).

In addition, Dr. LaConsay's opinions in the MSS Form about the Plaintiff's limitations in carrying out complex instructions and interacting with others are inconsistent with the Plaintiff's own statements in her function report that she can drop off pay bills, follow instructions well, handle bank accounts, use a checkbook, drive a car, spend time with others, handle changes in routine well, go to the post office to drop off bills, go to church regularly, and shop for groceries for 45 minutes to an hour a week. (*Id.* at 16 & 188-89).[7] Dr. LaConsay assigned the Plaintiff a global assessment of functioning ("GAF") of 55, which indicates only moderate symptoms and is inconsistent with her opinion that the Plaintiff had several "marked" restrictions. (*see id.* at 346-47). Finally, as the ALJ painstakingly examined throughout his decision, Dr. LaConsay's conclusions in the MSS Form regarding the Plaintiff's "significant depression & anxiety" is contradicted by the conservative, limited nature of the treatment advised or obtained through Dr. Ndolo or any other source. (S*ee id.* at 18-23, 291-41 & 356-63).[8] For these reasons, the Court finds that the evidence, as articulated by the ALJ, supports an opinion regarding the Plaintiff's mental restrictions contrary to Dr. LaConsay's

_____

[7] The Plaintiff also denied having any problems getting along with authority figures or ever being laid off for problems getting along with others. (Tr. at 190-91). Although it is acknowledged that she may have experienced difficulty in her last job, she testified that this was a high stress situation caused by a particular manager. (*Id.* at 34-35). She ultimately stated that she only *"sometimes* cannot face people." (*Id.* at 191).

[8] As the ALJ indicated, the Plaintiff has never required inpatient treatment, emergency treatment, specialist treatment, or even individual therapy for mental health issues. (Tr. at 21). Also, there is no evidence that the Plaintiff even sought out a counselor, community program, or church program of any type. (*Id.*). Further, there is only one indication during treatment with a physician–Dr. Lourdes Virtusio in December 2012–that they "will do a psychiatric referral," but such referral never occurred. (*See id.* at 291). In fact, the Plaintiff stopped obtaining treatment from Dr. Virtusio following that recommendation, and the Plaintiff testified that she has never been treated by a psychiatrist or psychologist. (*Id.* at 21 & 36-39).

conclusions in the MSS Form.  Thus, the ALJ's decision to not give "any significant weight" to the opinion evidence MSS Form is supported by substantial evidence.

As for Dr. Koulianos and Dr. Kravitz, the ALJ gave their opinions "great weight" because "[t]heir conclusions are the most consistent with the remainder of the evidence[,] [t]heir specializations in mental health treatment provide their opinions added weight[, and their opinions] are largely consistent with the observations throughout the treatment notes regarding the limited nature of symptoms and the effectiveness of treatment over time."  (*Id.* at 23).  Dr. Koulianos provided her opinions through a Psychiatric Review Technique ("PRT") form and a Mental Residual Functional Capacity Assessment, both dated June 15, 2011.  (*See id.* at 241-58).  In the PRT form, Dr. Koulianos opined that the Plaintiff has "moderate" difficulties in maintaining social functioning and concentration, persistence, or pace.  (*See id.* at 251).  In the Mental RFC Assessment, Dr. Koulianos concluded that the Plaintiff is not "markedly limited" in any area but is "moderately limited" in her ability to (a) understand and remember detailed instructions; (b) carry out detailed instructions; (c) maintain attention and concentration for extended periods; (d) interact appropriately with the general public; and (e) respond appropriately to changes in the work setting. (*Id.* at 255-56).  On August 29, 2011, Dr. Kravitz conducted a review of Dr. Koulianos' form and assessment indicating his agreement.  (*See id.* at 282-86).

An ALJ is "required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.'" *Square v. Colvin*, No. 15-00037-B, 2016 WL 1175274, at *3 (S.D. Ala. Mar. 25, 2016) (citing *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (unpublished)); *see also* 20 C.F.R. §404.1527(e)(2)(i).  Further, an ALJ may rely on opinions of non-examining sources

when they do not conflict with those of examining sources.  *Id.*  As previously discussed, the ALJ (a) articulated good cause to give "no weight" to Dr. Ndolo's opinion in his mental RFC questionnaire and (b) properly did not give "any significant weight" to Dr. LaConsay's opinion in the MSS Form.  As a result, the opinions of Dr. Koulianos and Dr. Kravitz do not conflict with any credible examining source, and, thus, their opinions were properly considered by the ALJ.  *See Thomas v. Colvin*, No. 11-00569-B, 2015 WL 4458861, at \*14 & n.8 (S.D. Ala. July 21, 2015).[9]  For these reasons, and because the Plaintiff does not make any additional arguments regarding the ALJ's determination of her RFC,[10] the Court finds that the ALJ's RFC determination is supported by substantial evidence in the record.

## II.    The ALJ's Identification of Jobs

At the fifth step of the Commissioner's evaluation, the Commissioner must establish that a significant number of jobs exist in the national economy that the Plaintiff can perform given her RFC, age, education, and work experience.  *See, e.g., Bellew v. Acting Comm'r of Soc. Sec.*, 605 F. App'x 917, 930 (11th Cir. 2015) (citation omitted).  "An

---

[9] The Plaintiff also argues that the ALJ erred in giving greater weight to the opinions of Dr. Koulianos and Dr. Kravitz than the opinions of Dr. LaConsay because the documents reviewed by Dr. Koulianos precede the Plaintiff's alleged onset date.  (Doc. 12 at 14).  However, as the Court previously discussed in more detail, the ALJ discredited Dr. LaConsay's opinion in her MSS Form irrespective of the opinions of Dr. Koulianos and Dr. Kravitz.  (Tr. at 23).  Instead, the ALJ considered the opinions of Dr. Koulianos and Dr. Kravitz, as he was required to do, and found that their opinions were consistent with the rest of the evidence, namely the treatment notes regarding the limited and conservative nature of the Plaintiff's symptoms and treatment.  (*Id.* at 20-23).

[10] At the October 29, 2015 hearing before the Court, counsel for the Plaintiff stated that the Plaintiff is not attacking any aspect of the ALJ's RFC determination other than his assessment of the opinion evidence provided by Dr. Ndolo, Dr. LaConsay, Dr. Koulianos, and Dr. Kravitz.

ALJ may make this determination either by applying the Medical Vocational Guidelines or by obtaining the testimony of a vocational expert." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (citing *Phillips*, 357 F.3d at 1239-40).  Here, of course, in finding that the Plaintiff could perform other work existing in significant numbers in the national economy  (*see* Tr. at 24-25), "the ALJ relied exclusively on the testimony of a vocational expert[.]"  *Dial v. Comm'r of Soc. Sec.*, 403 F. App'x 420, 421 (11th Cir. 2010). "'In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.'" *Winschel*, 631 F.3d at 1180 (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam)); *see also Dial*, 403 F. App'x at 421 (holding that where an ALJ failed to include all of the claimant's "employment limitations in the hypothetical questions posed to the VE . . ., the VE's testimony did not constitute substantial evidence upon which the ALJ could rely.").

In this case, the Plaintiff contends that the ALJ erred in finding that she can perform work existing in significant numbers in the national economy because the ALJ identified "silver wrapper" and "night cleaner," two jobs at the light, unskilled level, as available jobs the Plaintiff can perform.  The Plaintiff contends that the identification of these two jobs constitutes an error because Grid Rules 202.04 and 202.06 direct a finding of "disabled" if the Plaintiff is limited to light, unskilled work.  The ALJ, however, also identified the occupations of "packager" and "laundry aide," two jobs at the medium, unskilled level provided by the VE at the hearing before the ALJ as occupations the

Plaintiff would be able to perform, as jobs existing in significant numbers in the national economy.[11]  (*Id.* at 24-25).

Assuming *arguendo* that the ALJ did err in identifying the jobs of "silver wrapper" and "night cleaner," such error is harmless as the ALJ also identified two jobs at the medium, unskilled level that the Plaintiff would be able to perform and that exist in significant numbers in the national economy.  *See Caldwell v. Barnhart*, 261 F. App'x 188, 190 (11th Cir. 2008) (unpublished) (affirming the lower court's determination that the ALJ's failure to include certain limitations in the VE hypothetical was harmless error because the omitted limitations would not affect the claimant's ability to perform one of the jobs identified by the VE as appropriate for the claimant), *Robinson v. Colvin*, No. 14-00084-N, 2015 WL 1520431 at *12-14 (S.D. Ala. Apr. 2, 2015) (rejecting the claimant's argument that the ALJ erred by relying on a VE's improper identification of two occupations when the claimant did not object to the third job identified by the VE as appropriate for the claimant), *Blake v. Colvin*, No. 2:13-cv-01799-LSC, 2014 WL 5393876, at *7 (N.D. Ala. Oct. 23, 2014) (citations omitted) ("[E]ven if this Court were to agree . . . that the ALJ did limit [the claimant] to unskilled work, his determination of the number of jobs available to her in the national economy that are light or sedentary and unskilled is still 'significant,' as required by the regulations.  Even disregarding all semi-skilled jobs . . . about which the VE testified and that the ALJ found [the claimant] could perform, the ALJ still found that there exist—at the unskilled level—75,000 jobs

---

[11] Specifically, as the ALJ stated in his decision, the VE testified that there are approximately 4,000 "packager" jobs in the state in Alabama, 330,000 "packager" jobs in the national economy, 4,000 "laundry aide" jobs in the state of Alabama, and 400,000 "laundry aide" jobs in the national economy.  The Court notes that the Plaintiff does not argue that she is unable to perform the jobs of "packager" or "laundry aide."

nationally that [the claimant] could perform.  The ALJ could have found these job numbers alone to be 'significant in the national economy.'  Accordingly, a remand to correct this harmless error would be unwarranted; it would amount to 'an empty exercise,' as the result of the ALJ's decision would not change."), *Brown v. Astrue*, No. 3:11-cv-806-J-JRK, 2012 WL 2979046, at *3-6 (M.D. Fla. July 20, 2012) ("Plaintiff and the Commissioner recognize that the VE likely erred in citing to the food checker position, because it appears the VE actually described the position of food and beverage checker (DOT number 211.482–018), a light duty position. This error is harmless given that the VE cited to two other jobs with sufficient numbers in the national economy that Plaintiff can perform, i.e. office helper (272,000 jobs nationally; 14,000 jobs in Florida) and cashier II (283,000 jobs nationally; 9,230 jobs in Florida)."), *Moorer v. Astrue*, No. 3:11cv397/LAC/EMT, 2012 WL 3537023, at *9-10 (N.D. Fla. July 16, 2012) ("[E]ven if the ALJ erred [by including most, but not all, of a specific physician's opinions in the RFC or by relying on the VE's opinion that the claimant could perform jobs with the RFC determined by the ALJ], the error was harmless because significant numbers of jobs remain available even taking into account all of [said physician's] opinions."); *see also Brooks v. Barnhart*, 133 F. App'x 669, 671 (11th Cir. 2005) (unpublished) (finding that the ALJ's determination that 840 jobs constituted a significant number in the national economy was supported by substantial evidence), *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (upholding an ALJ's finding that work existed in significant numbers where the VE testified that there were 174 small appliance repairman positions in the area where the claimant resided).  Consequently, the Court finds that the ALJ's determination at the fifth step of the sequential evaluation–that a significant number of jobs exist in the national economy that the Plaintiff can perform given her RFC, age, education, and work experience–is supported by substantial evidence.

<u>**CONCLUSION**</u>

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying the Plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 13th day of April 2016.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**